# EXHIBIT C



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

## TODD ROKITA
### ATTORNEY GENERAL

May 9, 2025

Rev. Robert A. Dowd
Office of the President
University of Notre Dame
400 Main Building
Notre Dame, Indiana 46556

> Re: University of Notre Dame's Compliance with Federal and State Civil Rights Laws and Indiana Code § 23-17-24-1 *et seq*.

Dear Rev. Robert A. Dowd:

I write concerning the University of Notre Dame's compliance with federal and state civil rights laws and the terms of the University's nonprofit status under Indiana Code § 23-17-24-1 *et seq*. Publicly available materials suggest that various aspects of Notre Dame's operations may be governed by University policies that treat individuals—including students, prospective students, faculty, staff, and job applicants—differently based on the individuals' race or ethnicity; employ race in a negative manner; or utilize racial stereotyping. Such policies, if maintained, would constitute an "abuse [of] the authority" conferred on the University by Indiana's nonprofit laws and may also indicate that the University's "assets are being misapplied or wasted." Ind. Code § 23-17-24-1(a). Failure to correct such policies and bring them into compliance with state and federal law could result in legal action by my office pursuant to Indiana Code § 23-17-24. I ask that the University respond to the questions contained herein to assist my office in evaluating whether further action is warranted to ensure Notre Dame is acting consistent with the terms of its nonprofit status.

Nonprofit corporations organized in Indiana must be "organized for a public or charitable purpose." Ind. Code § 23-17-2-23(1). State law provides that whether a corporation is organized for a public or charitable purpose is determined in much the same way the Internal Revenue Service determines whether an organization is operated for a charitable purpose or other purpose to benefit the public under 26 U.S.C. § 501 and therefore exempt from federal taxation. *See* Ind. Code § 23-17-2-23(1)(C) (defining "public benefit corporation" to include an organization "recognized as tax exempt under Section 501(c)(3) of the Internal Revenue Code"); Ind. Code § 6-3-2-2.8(1) (exempting from state income taxation "[a]ny organization described in Section 501(a) of the Internal Revenue Code"). In consequence, federal tax law concerning nonprofits is instructive on whether a nonprofit entity is organized for a public or charitable purpose under Indiana law.

To qualify as an organization operating for charitable purposes or the public benefit, an entity's "purpose must not be so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred." *Bob Jones Univ. v. United States*, 461 U.S. 574, 592 (1983). It is beyond question that "racial discrimination in education violates deeply and widely accepted views of elementary justice" in Indiana and the United States. *Id*. Moreover, a private school's "legitimate educational function cannot be isolated from discriminatory practices" because "discriminatory treatment exerts a pervasive influence on the entire educational process." *Norwood v. Harrison*, 413 U.S. 455, 469 (1973). Thus, it is well settled that educational institutions that "practice racial discrimination," are not "institutions exercising 'beneficial and stabilizing influences in community life.'" *Bob Jones University*, 461 U.S. at 595 (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 673 (1970)). Accordingly, a nonprofit university that engages in racial discrimination is not "organized for a public or charitable purpose" within the meaning of Indiana law, Ind. Code § 23-17-2-23(1), and any racial discrimination in which it engages represents an unlawful "abuse [of] authority," Ind. Code § 23-17-24-1(a).

In *Students for Fair Admission, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), the Supreme Court held that racially discriminatory practices in higher education can rarely if ever be squared with federal civil rights laws, no matter what a university's justification for the practices may be. For example, the Court rejected the notion that taking race into account in admissions permissibly serves the supposed interest in "producing new knowledge stemming from diverse outlooks." *Id*. at 214. Universities also must "never use race as a stereotype or negative" in how they treat students, faculty, and staff. *Id*. at 213. Further, "universities may not simply establish through application essays or other means" a race-based admissions process that uses other factors as proxies for race. *Id*. at 230.

Thus, virtually all forms of racial discrimination—even those employed in service of the interests of diversity, equity, and inclusion—are unlawful. Likewise, discriminatory practices perpetuated "for whatever reasons," and even with good intentions, still jeopardize and are inconsistent with a university's nonprofit status. *Bob Jones University*, 461 U.S. at 595.

*Students for Fair Admissions* marked a watershed moment in the advancement of civil rights in this country by making perfectly clear that no form of racial discrimination can be licensed in our higher education system. Yet it seems the University of Notre Dame may have met that moment and the Court's decision with evasion, circumvention, and obstruction, rather than a good faith desire to respect the civil rights of students and faculty.

In its 2033 Strategic Framework, published in August 2023, the University expressed its commitment to "diversity and inclusion."[1] The Framework indicates that the University understands diversity largely in racial terms, placing emphasis on the work of campus organizations like the "Initiative on Race and Resilience" and calling for an assessment of "race

---

[1] University of Notre Dame, *Notre Dame 2033: A Strategic Framework,* Pg. 18–19 (August 30, 2023).

and racism" within and without the University's campus.  The Framework describes the University's diversity efforts as being, in part, "representational" and highlights the fact that the "undergraduate student population at Notre Dame is now more diverse than at any point in its history, with 33 percent of students in the Class of 2022 identifying themselves as members of underrepresented groups."  But the Framework stresses that "more needs to be done to recruit underrepresented students" and that, while *Students for Fair Admissions* will "complicate" the University's efforts, it will "not deter" the University from pursuing its goal of achieving what it considers to be the proper level of diverse representation.

The Framework's discussion of faculty diversity is even more overtly race-focused.  The University touts its success adding more "Latino faculty," but notes that it still has work to do to make its faculty more diverse.  The Framework states with disapproval that "students from underrepresented groups routinely attend classes for four years at Notre Dame without enrolling in a course taught by someone who looks like them."[2]

In Indiana, what someone looks like—and in particular a person's race or the color of his skin—is not a lawful basis on which to make hiring, promotion, admissions, or other student or employment-related decisions.  Our State's laws plainly demonstrate that Indiana "has a fundamental, overriding interest in eradicating racial discrimination in education."  *Bob Jones University*, 461 U.S. at 604; *see* Ind. Code § 22-9-1-2(a) ("It is the public policy of the state to provide all of its citizens equal opportunity for education . . . and to eliminate segregation or separation based solely on race.").  Actions by a university organized as a nonprofit that appear to contravene such deeply rooted state policy raise a host of quesitons about whether the university is serving a public or charitable purpose.

To assist my office in assessing Notre Dame's compliance with civil rights laws and the terms of its nonprofit status, I ask that you please respond to the following questions and requests:

(1) Produce all documents and communications concerning any changes the University made to its hiring or admissions processes following the Supreme Court's decision in *Students for Fair Admissions*.

(2)  Produce all documents and communications discussing the ways in which the decision in *Students for Fair Admissions* "complicated" the University's efforts to increase the representation in its student body of "underrepresented groups."

---

[2] The University's statements in the 2033 Strategic Framework are just one of many examples found in publicly available materials that suggest the University engages in legally dubious, race-conscious practices.  For instance, the University appears to host racially segregated "recognition ceremonies" for graduting students.  The University also is under investigation by the U.S. Department of Education for partnering with an organization—the Ph.D Project—that provides assistance to graduate students but purports to limit eligiblity based on race.

(3) Produce all documents and communications concerning whether and how race is considered, either directly or indirectly, in faculty hiring and student admissions decisions.

(4) Produce all guidance provided to faculty and admissions staff concerning the University's diversity and inclusion goals.

(5) Produce all drafts of and other materials the University relied upon in preparing the section of the 2033 Strategic Framework concerning diversity and inclusion.

(6) How does the University determine who counts as a member of an underrepresented group for purposes of implementing the 2033 Strategic Framework and how does the University track the number of students from underrepresented groups that it admits?

(7) What actions did the University take to increase the number of "Latino faculty" it employs, as discussed in the 2033 Strategic Framework, and what other specific actions is it taking to enhance the diversity of its faculty?

(8) What actions is the University taking to recruit more "underrepresented students"?

(9) How does the University track and evaluate whether and how frequently students enroll in classes taught by faculty that "look like" them?

(10) How does the University determine who is invited to attend or be recognized at its multicultural recognition ceremonies for graduating students?

Please provide this information to the Office of the Indiana Attorney General within 30 days, by June 9, 2025.

Thank you for your time and attention regarding this important matter.

Sincerely,

Todd Rokita

TER/bl

4